UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN DOE,                                          :

                Plaintiff,        :

      -against-                               :                04 Civ. 0570 (GBD) (AJP)

                       :                **REPORT AND RECOMMENDATION**

GLENN S. GOORD, et al.,                       :

              Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Chief Magistrate Judge:**

**To the Honorable George B. Daniels, United States District Judge:**

        Pro se plaintiff "John Doe," an inmate in the custody of the New York State

Department of Correctional Services ("DOCS"), brings this action pursuant to: 42 U.S.C. § 1983

alleging violations of his Eighth and Fourteenth Amendment rights by prison officials and by the

Office of Alcoholism and Substance Abuse Services ("OASAS"); Title II of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12132; and Section 504 of the Rehabilitations Act, 29 U.S.C.

§ 794.  (Dkt. No. 21: 2d Am. Compl., "Statement of Case" ¶ 2.)

        On December 10, 2004, this Court issued a Report and Recommendation that

defendants' motion to dismiss be granted in part and denied in part.  Doe v. Goord, 04 Civ. 0570,

2004 WL 2829876 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.).  On August 2, 2005, Judge Daniels

H:\OPIN\DOE

adopted the Report and Recommendation.  (Dkt. No. 51: 8/2/05 Judge Daniels Order Adopting

Report & Rec.)

Presently before the Court is defendants' motion for summary judgment on the

remaining claims.  (Dkt. No. 42; see also Dkt. Nos. 43-45, 50.)  The Court observes, in fact, that in

denying defendants' motion to dismiss, the Court noted that Doe's case might well be dismissed at

the summary judgment stage.  Doe v. Goord, 2004 WL 2829876 at *13 n.29 ("The fact that Doe has

received some treatment for his drug addiction, albeit ineffective according to Doe, may provide the

basis for dismissal of this claim on a summary judgment motion . . . "), *14 n.30, *17.  For the

reasons discussed below, defendants' summary judgment motion in fact should be GRANTED.

## FACTS

Doe has been incarcerated on his current conviction since 1991.  (Dkt. No. 42: Defs.

Rule 56.1 Stmt. ¶ 15; Dkt. No. 48: Doe Rule 56.1 Stmt. ¶ 15; Dkt. No. 42: Schulman Aff. Ex. A:

Doe Dep. at 74-75.)[1/]  Doe has a long and turbulent history of heroin addiction that began in 1970

or 1971.  (Doe Dep. at 24.)

### Doe's Criminal and Drug Treatment History

Doe's first adult conviction was in 1970, for which he was placed on youthful

offender status and not incarcerated.  (Defs. & Doe Rule 56.1 Stmt. ¶ 17; Doe Dep. at 15-16.)  In

1973, Doe was convicted of  first degree sexual abuse and placed on probation for five years.  (Defs.

---

[1/]      Doe attached his deposition to his Rule 56.1 Statement as well.  (See Dkt. No. 48: Doe Rule
          56.1 Stmt. Ex. B.)  Due to the large amount of times the Court cites to Doe's deposition, it
          is hereinafter cited as "Doe Dep." without reference to the party's affidavit to which it is
          attached.

& Doe Rule 56.1 Stmt. ¶ 18; Doe Rule 56.1 Stmt. Ex. C: Inmate Status Report for Parole Board Appearance at R56.)  Pursuant to that conviction, Doe was certified as an addict[2] and, as a result, was placed in the custody of the Narcotics Addiction Control Commission ("NACC"), later known as the Drug Abuse Control Commission ("DACC").  (Defs. & Doe Rule 56.1 Stmt. ¶ 18; Doe Dep. at 16; Dkt. No. 21: 2d Am. Compl. Att.: Certification of Addiction at A1-A3.)

        While in the custody of DACC, Doe was placed in several drug treatment facilities. (Defs. & Doe Rule 56.1 Stmt. ¶ 19; Doe Dep. at 16-17.)  Following an inpatient treatment phase, Doe was placed in an outpatient program, during which he was arrested for mostly misdemeanor drug offenses for which he served jail sentences and then was returned to DACC custody.  (Defs. & Doe Rule 56.1 Stmt. ¶ 19; Doe Dep. at 19.)

        In 1979, Doe was convicted of second degree robbery, a felony.  (Doe Rule 56.1 Stmt. Ex. C: Inmate Status Report at R57; Doe Dep. at 20.)  During his imprisonment, he participated in Narcotics Anonymous.  (Doe Rule 56.1 Stmt. ¶ 22.)  Doe was paroled in summer 1983.  (Doe Rule 56.1 Stmt. Ex. C: Inmate Status Report at R57.)  Doe was free for one week in 1983 when he was arrested and returned to prison for committing third degree robbery, which he committed to support his heroin addiction.  (Doe Rule 56.1 Stmt. ¶ 22 & Ex. C: Inmate Status Report at R57; Doe Dep. at 20.)  While in prison, Doe participated in Narcotics Anonymous and Alcoholics Anonymous ("AA") programs.  (Doe Rule 56.1 Stmt. ¶ 22.)  In January 1987, Doe was paroled but was arrested

---

[2]     Doe and defendants disagree over whether this certification is still valid or whether it was terminated by legislative action in 1980.  (Compare Doe Rule 56.1 Stmt. ¶ 21, with Defs. Rule 56.1 Stmt. ¶ 21.)

again in October 1987 for conspiracy to commit drug related offenses and sentenced to two to four years imprisonment.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 22-23; Doe Rule 56.1 Stmt. Ex. C: Inmate Status Report at R57; Doe Dep. at 21.)  During his imprisonment in 1990, Doe participated in weekly Narcotics Anonymous and AA meetings for about eighteen months.  (Doe Dep. at 97; Doe Rule 56.1 Stmt. ¶ 23.)

After being released on parole on August 2, 1991, Doe was arrested two months later on his current offense, second degree attempted robbery.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 23, 25; Doe Rule 56.1 Stmt. Ex. C: Inmate Status Report at R57; Doe Dep. at 22, 132.)  Doe was sentenced to a term of ten years to life, which he is currently serving.  (Defs. & Doe Rule 56.1 Stmt. ¶ 25; Doe Rule 56.1 Stmt. Ex. C: Inmate Status Report at R57.)  Doe became eligible for parole in 2001, but has no conditional release date.  (Defs. & Doe Rule 56.1 Stmt. ¶ 25.)

While on parole from his various convictions, Doe "rarely worked."  (Doe Dep. at 14.)  Doe "attempted to work in the real estate business, but . . . never maintained a job for long." (Doe Dep. at 14, 23.)  Prior to his latest arrest, Doe had been working for relatives but was fired because of his drug use.  (Doe Dep. at 23.) Doe did not seek drug treatment while on parole in 1983, 1987 and 1991.  (Defs. & Doe Rule 56.1 Stmt. ¶ 24.)

**Doe's Institutional Record**

Doe has lived in prison dormitories or unlocked rooms since 1997 and has had a clean prison disciplinary record since July 1998.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 73, 75; Doe Rule 56.1 Stmt. Ex. C: Inmate Disciplinary History at 3-6.)  Doe successfully completed the Aggression

Replacement Training program and the primary, secondary, and facilitator levels of the Alternatives to Violence Program.  (Defs. & Doe Rule 56.1 Stmt. ¶ 61.)

      During his incarceration pending trial in 1972, Doe received a general equivalency diploma.  (Defs. & Doe Rule 56.1 Stmt. ¶ 14; Doe Dep. at 11.)  Doe also received college credit from Skidmore College while imprisoned, which "ultimately led to receipt of a Bachelor of the Arts Degree in Sociology, while unincarcerated in 1987."  (Defs. & Doe Rule 56.1 Stmt. ¶ 14.)  While serving his current term, in 2001 Doe received a Masters of Professional Studies degree from New York Theological Seminary.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 14, 61.)  While in prison, Doe has worked as a paralegal, maintenance worker, porter, industries worker, clerk, printer, and program aide, and currently works in the facility law library.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 61, 64.)

**Doe's Drug Treatment and Program Applications During His Current Prison Term**

      Although Doe claims he still suffers from heroin addiction because addiction is a lifelong disease, he has not used any illegal narcotics since he was arrested in October 1991.[3/]  (Defs. Rule 56.1 Stmt. ¶¶ 15, 26, 72; Doe Dep. at 23, 39; Doe Rule 56.1 Stmt. Ex. C: Inmate Disciplinary History at 3-6.)

---

[3/]    Defendants dispute the fact that Doe is still an addict or a substance abuser. As proof of his rehabilitation, they point to, inter alia, his 14 year abstinence from using illegal drugs and his frequent denials to medical doctors and nurses that he is an addict.  (Defs. Rule 56.1 Stmt. ¶¶ 15, 66, 72.)  Doe counters that the only reason he has been able to remain abstinent for so long is that heroin is not available to him in prison.  (Doe Rule 56.1 Stmt. ¶ 15.)  Moreover, Doe points to his criminal and incarceration history as proof that a long absence from heroin does not cure his addiction.  (Doe Dep. at 41.)  Doe never used illegal narcotics during any of his prior prison sentences and yet was arrested for drug related infractions shortly after each release. (Doe Rule 56.1 Stmt. Ex. C: Inmate Disciplinary History at 3-5; Doe Rule 56.1 Stmt. ¶ 22.)

In 1995, Doe satisfactorily completed the Alcohol Substance Abuse Treatment ("ASAT") program after more than 330 hours of program participation.  (Defs. & Doe Rule 56.1 Stmt. ¶ 28; Doe Rule 56.1 Stmt. Ex. D & Schulman Aff. Ex. L: ASAT Discharge Evaluation at 974-78; Doe Dep. at 91.)  ASAT is a "Twelve-Step" program modeled after Narcotics Anonymous and Alcoholics Anonymous.   (Doe Dep. at 91-92; Doe Rule 56.1 Stmt. Ex. D: ASAT Program Operations Manual at 1417.)[4/]  The ASAT mission statement explains that the program is meant "[t]o prepare chemically dependent inmates for return to the community and to reduce recidivism." (Doe Rule 56.1 Stmt. Ex. D: ASAT Program Operations Manual at (4)III.A.)  ASAT involves prisoner led self-help groups in a dormitory setting for five days a week.  (Defs. & Doe Rule 56.1 Stmt. ¶ 28; Doe Dep. at 91-92.)  The prisoners also watch videos and read hand-outs.  (Doe Rule 56.1 Stmt. ¶ 28; Doe Rule 56.1 Stmt. Ex. D: ASAT Program Operations Manual at 1419, 1422.)[5/]  Doe testified that the group discussions are mostly run by prisoner-facilitators or the counselors "may sit in sometimes."  (Doe Dep. at 98.)  On Doe's ASAT Discharge Evaluation form, the "ASAT staff observations and/or recommendations" were that Doe "continue to seek needed programs" and "identify appropriate support elements for future reference, if needed."  (Doe Rule 56.1 Stmt. ¶ 28 & Ex. D: ASAT Discharge Evaluation at 976.)

---

[4/]     Doe testified at his deposition that he participated in ASAT during a prior sentence in 1987. (See Doe Dep. at 91; see also Doe Rule 56.1 Stmt. Ex. D: ASAT Discharge Evaluation at 976: "Prior alcohol or substance abuse treatment" listed as "Altoona, 1987 completed.")

[5/]     According to Doe, at no time were there any "specialists" present at the ASAT meetings. (Doe Dep. at 98.)  The only counselors available were present to do "mostly administrative functions."  (Id. at 92.)

In 1999, while incarcerated at Franklin Correctional Facility, Doe applied for the Comprehensive Alcohol and Substance Abuse Treatment ("CASAT") program for the first time. (Defs. & Doe Rule 56.1 Stmt. ¶ 30; Doe Dep. at 44-45.)  CASAT is a presumptive work release program designed to prepare chemically dependent inmates to return to the community.  (Defs. & Doe Rule 56.1 Stmt. ¶ 31.)  See 7 NYCRR § 1950.1.  CASAT is a three-phase program.  (Defs. & Doe Rule 56.1 Stmt. ¶ 31.)  The first phase requires participation in an alcohol and substance abuse treatment program within the correctional facility.  (Defs. & Doe Rule 56.1 Stmt. ¶ 31, citing 7 NYCRR § 1950.2.)  Inmates participating in the second phase of CASAT are integrated into society through a "transitional period in a community reintegration component, including transfer to a work release facility or similar arrangement."  (Id.; see Doe Dep. at 111-13.)  The third-phase consists of "an aftercare component in the community under parole supervision." (Defs. & Doe Rule 56.1 Stmt. ¶ 31, citing 7 NYCRR § 1950.2.)  To be eligible for CASAT, inter alia, "an inmate must be at least 12 but no more than 24 months from earliest release."  (Defs. & Doe Rule 56.1 Stmt. ¶ 32.)  An inmate may be deemed unsuitable for CASAT based on crime of commitment and/or criminal history.  (Id., citing 7 NYCRR § 1951.2.)  Pursuant to Executive Order 5.1 (1995), all violent offenders were prohibited from admission into any temporary release program or residential treatment facility."  9 NYCRR § 5.5.

Doe's 1999 CASAT application was denied by the DOCS Central Office Temporary Release Program Reviewer because of Doe's recidivist history, the nature of his current incarceration, and because of the determination that Doe posed a risk to the community:  "[S]ubstance abuse does

not minimize legal history.  Recidivism reflects no gain from legal intervention that has included parole.  Presumptive work release is denied.  Inmate [Doe] urged to participate in other programs to address therapy need."  (Schulman Aff. Ex. C[6]: 4/13/99 Notice of Disapproval for Presumptive Work Release at A56; Defs. & Doe Rule 56.1 Stmt. ¶ 30.)

In 2001, Doe made written and oral requests to defendant senior corrections counselor Anne Raimondo and defendant corrections counselor Edward Tully for comprehensive substance abuse care.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 8, 10, 38; Doe Dep. at 49-51; see Schulman Aff. Ex. C: 8/14/01 Doe Letter to Raimondo at A25.)  On August 14, 2001, a week before his parole hearing, Doe submitted a written request for work release or, in the alternative, admission to CASAT.[7] (Defs. & Doe Rule 56.1 Stmt. ¶¶ 38, 41; Schulman Aff. Ex. C: 8/14/01 Doe Letter to Raimondo at A25.)

On September 17, 2001, Doe's application for CASAT and/or temporary work release was "disapproved" by Sing Sing's Temporary Release Committee because of Doe's recidivism and violent criminal history.  (Defs. & Doe Rule 56.1 Stmt. ¶ 39; Schulman Aff. Ex. C: 9/17/01 Work

---

[6]     Doe submitted the same documents as those contained in Exhibit C to Schulman's affidavit; Doe's copy of the documents are within Exhibit F to his Rule 56.1 Statement.

[7]     Doe had previously submitted three separate applications for work release that were each approved at the facility level but denied at the DOCS departmental level. (Defs. & Doe Rule 56.1 Stmt. ¶ 38; Schulman Aff. Ex. C: 8/14/01 Doe Letter to Raimondo at A25.)

Release Denial/Appeal Form at A26.)  Defendants Raimondo[8] and Laurie Campbell[9] were among those on the Temporary Release Committee.  (Defs. & Doe Rule 56.1 Stmt. ¶ 39; Schulman Aff. Ex. C: 9/17/01 Work Release Decision Form at A26.)  Doe appealed the decision, arguing, among other things, that he had not been considered for CASAT, only work release.  (Defs. & Doe Rule 56.1 Stmt. ¶ 39; Doe Rule 56.1 Stmt. Ex. F: 10/3/01 Appeal for Temporary Release at 99-101.)  On December 5, 2001, Doe's appeal was denied, for the same reason.  (Defs. & Doe Rule 56.1 Stmt. ¶ 39; Schulman Aff. Ex. C at A30: Temporary Release Notice of Appeal Decision.)  The decision indicated Doe could reapply for work release in August 2003. (Id.)

Doe testified that when he asked Raimondo why he had not been processed for CASAT, she told him it was because he was not time eligible.  (Defs. & Doe Rule 56.1 Stmt. 40; Doe Dep. at 50-51.)  However, at the time of the committee's decision, Doe's next earliest possible parole appearance was twenty-three months later in August 2003, within the twelve to twenty-four month time eligibility period for applying to CASAT.  (Doe Rule 56.1 Stmt. ¶ 40.)  Doe asserts that he was never processed for CASAT.  (Doe Dep. at 49-50.)

Doe testified that in 2003, incarcerated at Mid-Orange Correctional Facility (Defs. & Doe Rule 56.1 Stmt. ¶ 42), he told counselor Campbell that he wanted to apply for CASAT but Campbell told him that he was not time eligible.  (Doe Dep. at 122.)  In July 2003, Doe filed an

---

[8]     Raimondo was the chair of the Temporary Release Committee.  (Defs. & Doe Rule 56.1 Stmt. ¶ 39.)

[9]     Defendant Laurie Campbell later became Doe's corrections counselor at Mid-Orange Correctional Facility.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 11, 39.)

inmate grievance requesting placement in a "residential substance abuse treatment" program that "accommodates violent felons."  (Defs. Rule 56.1 Stmt. ¶ 45; Schulman Aff. Ex. B at 25: 7/7/03 Grievance.)  On July 11, 2003, after interviewing Doe in connection with the grievance, defendant senior corrections counselor Juan Hodelin sent a memo to defendant Cheryl Kjellander explaining that Doe sought admission to CASAT but that he was not eligible for it.  (Defs. & Doe Rule 56.1 Stmt. ¶¶ 46-47; Schulman Aff. Ex. B: 7/11/03 Hodelin Memo at 27.)

On July 21, 2003, defendant Superintendent Susan Schultz denied Doe's grievance based on the information provided her by Hodelin.  (Defs. Rule 56.1 Stmt. ¶ 52; Schulman Aff. Ex. B: Inmate Grievance Program Superintendent at 21.)  Supt. Schultz  noted that Doe was not taking advantage of NA or AA and reminded Doe that per DOCS directive, "program assignments are made at the discretion of the facility administration."  (Defs. & Doe Rule 56.1 Stmt. ¶ 52; Schulman Aff. Ex. B at 21 & Doe Rule 56.1 Stmt. Ex. G at 21.)[10]  Doe appealed his grievance to the Central Office Review Committee ("CORC"), rearticulating his plea for "a comprehensive therapeutic residential

---

[10]    Doe's grievance was entitled "wants RSAT" which Doe contends was an intentional mischaracterization by defendant Kjellander.  (Doe Rule 56.1 Stmt. ¶¶ 49-50; see Doe Rule 56.1 Stmt. Ex. G at 1: Case History and Record & Ex. G at 21: Inmate Grievance Program Superintendent.)  First, on Doe's "Case History and Record" sheet, tracing the path of his grievance through the appeals process, the "Wants RSAT" title was crossed out to read "Wants CASAT." (Doe Rule 56.1 Stmt. Ex. G at 1.)  Second, even though the title on Supt. Schultz's denial of his grievance was "wants RSAT," Supt. Schultz referred only to Doe's desire for CASAT in the text of her decision.  (Id., Ex. G at 21.)  Third, according to defendant Kjellander's response to Doe's interrogatory the "title of a grievance is irrelevant to the investigation or disposition of a grievance."  (Dkt. No. 45: Kjellander Int. Resp. No. 7.)  In any event, Kjellander stated that the title of a grievance is made by the inmate grievance clerk who is typically an inmate.  (Id.)  Kjellander points out that this is Doe's only claim against her.  (Defs. Rule 56.1 Stmt. ¶ 49; Doe Dep. at 62.)

substance abuse program with a community reintegration component."  (Defs. & Doe Rule 56.1 Stmt. ¶ 54; Schulman Aff.  Ex. B at 22-23: Doe Appeal Statement.)  On August 21, 2003, CORC affirmed the denial of Doe's grievance and explained that it had no jurisdiction over CASAT determinations because CASAT has its own appeal mechanism.  (Schulman Aff. Ex. B at 20: Inmate Grievance Program Central Office Review Committee.)  CORC also noted that Doe had "completed ASAT in 1995, thereby satisfying his requirement for a substance abuse program."  (Id.)

In July 2003, Doe also wrote letters to defendant DOCS Commissioner Goord,[11] defendant OASAS Commissioner Gorman[12] and defendant DOCS Deputy Commissioner of Programs John H. Nuttall[13] requesting DOCS and OASAS to provide him an "alternative comprehensive therapeutic residential treatment program" for which he, given his criminal history, could be eligible.  (Doe Rule 56.1 Stmt. Ex. C at 51-53, 72-73, 79-80; see Defs. & Doe Rule 56.1 Stmt. ¶ 55.)   Doe expressly informed those defendants of what he believed to be multiple constitutional and statutory violations.  (Doe Rule 56.1 Stmt. Ex. C at 51-53, 72-73.)  Nuttall responded to the letters on behalf of Commissioner Goord and himself, recommending that Doe appeal denial of his 1999 CASAT application or discuss with his counselor renewed application. (Doe Rule 56.1 Stmt. Ex. C at 46-47; see Defs. & Doe Rule 56.1 Stmt. ¶¶ 56, 59.)  Pursuant to

---

[11]    Goord is the Commissioner of Corrections for the State of New York.  (Defs. & Doe Rule 56.1 Stmt. ¶ 5.)

[12]    Gorman was Commissioner of OASAS from June 16, 2003 to March 11, 2005.  (Defs. & Doe Rule 56.1 Stmt. ¶ 6.)

[13]    Nuttall was the Acting Deputy Commissioner for Program Services.  (Doe Rule 56.1 Stmt. Ex. C: Nuttall's Response Letters to Doe at 46-47.)

Nuttall's recommendations, on August 25, 2003, Doe appealed the denial of his 1999 CASAT application only to be told that temporary release appeals must be made within thirty days of the denial of the application.  (Defs. & Doe Rule 56.1 Stmt. ¶ 63.)[14]

Doe's July 15, 2003 letter to OASAS Commissioner Gorman asserted that the failure of DOCS and OASAS to provide him adequate care contravened his Eighth and Fourteenth Amendment rights and did not comport with the ADA and the Rehabilitation Act.  (Doe Rule 56.1 Stmt. Ex. C at 51-53: Doe Letter to Gorman.) Doe received response letters from OASAS personnel, explaining that "OASAS does not directly provide chemical dependence treatment services at any location other than the 13 state-operated Addiction Treatment Centers," and that "the New York State correctional system is exempt by statute" from OASAS oversight.  (Doe Rule 56.1 Stmt. Ex. C at 49: OASAS Acting Executive Deputy Commissioner & General Counsel Joshua Toas Letter to Doe; id., Ex. C at 54: OASAS Addiction Program Specialist Letter to Doe; see Defs. & Doe Rule 56.1 Stmt. ¶¶ 57-58.)

Doe emphasizes that CASAT is the only program the State offers that could even "remotely" address his needs, but he recognizes that as a violent felon he is not eligible for that program.  (Doe Rule 56.1 Stmt. ¶ 46; Doe Dep. at 46-47, 53-54, 56-57.)  Further, Doe concedes that DOCS is entitled to evaluate whether he would be a danger to the community as part of its decision whether to grant him temporary release.  (Doe Dep. at 113.)

---

[14]   Doe avers that he did in fact file a timely handwritten appeal in 1999, but that it was misplaced by officials in Albany. (Doe Rule 56.1 Stmt. ¶ 63 & Ex. F: Doe 1999 Handwritten Appeal Letter at A57-58.)

**Doe's Parole Hearings and Subsequent Appeals**

   In August 2001, the Parole Board denied Doe parole based on his "extensive criminal history dating back to 1973 and including 7 prior felony convictions"; additionally, Doe's instant offense of "armed robbery of a bank" demonstrated a "continuation of [his] larcenous and violent behavior."  (Doe Rule 56.1 Stmt. Ex. E at R177: Parole Bd. Release Decision Notice.)  The Parole Board did take note of Doe's "positive institutional record and educational achievements," but concluded that his "propensity for recidivism and record of parole violations" precluded parole release.  (Id.)

   In August 2003, Doe was denied parole for the second time, again based on his "extensive criminal record" and "continuous involvement in the criminal justice system." (Schulman Aff. Ex. G: Parole Bd. Hearing Tr. at R69; <u>see also</u> Defs. & Doe Rule 56.1 Stmt. ¶ 60.)  Doe appealed the Parole Board's decision, claiming that it was "arbitrary and capricious" for not considering the recommendation of Judge Patrick H. Matthews at Doe's resentencing on June 16, 1998.  (<u>See</u> Schulman Aff. Ex. H: Parole Bd. Appeals Unit Findings & Recommendation at R112, explaining the grounds of Doe's appeal.)

   The pertinent comments by the resentencing judge in 1998 were:

   Notwithstanding the convictions in this particular case, for the nature of the crimes, I still am willing to state on the record that <u>I think you should be considered by parole at the earliest possible release date because I think that you have learned your lesson</u>. I think it took a lot of time, a lot of years.  I hope I'm right in this regard, but I think you've made up your mind you're not going to go back to your old ways.  I certainly hope that's the case.

(Schulman Aff. Ex. F: 6/16/98 Sentencing Tr. at R92, emphasis added.)  The Parole Appeals Unit affirmed the Parole Board's decision because there was no evidence that Doe submitted the judge's recommendation to the Board and "the Board is not obligated to seek a recommendation if one is not submitted." (Schulman Aff. Ex. H: Parole Bd. Appeals Unit Finding & Recommendation at R112; see also Defs. & Doe Rule 56.1 Stmt. ¶ 60.)

On February 24, 2004, Doe filed a C.P.L.R. Article 78 Petition for judicial review of the denial of parole.  (Defs. & Doe Rule 56.1 Stmt. ¶ 61; Schulman Aff. Ex. I: Doe Article 78 Petition.)  On October 28, 2004, the New York State Supreme Court granted Doe's application and remitted the matter to the Parole Board "for a de novo hearing" wherein the Board was instructed to "at a minimum consider the sentencing minutes and the recommendation of the judge." (Schulman Aff. Ex. J: 10/28/04 Judge Rosenwasser Decision & Order at R11; Defs. & Doe Rule 56.1 Stmt. ¶ 62.)  The Parole Board appealed the decision and Doe cross-appealed.  (Defs. & Doe Rule 56.1 Stmt. ¶ 62.)  As of the issuance of this Report and Recommendation, the cross-appeals are still pending.  (Id.; Schuman Aff. ¶ 5; 2d Dep't Clerk's Office Information.)

Doe was scheduled for a parole hearing in August 2005.  (Defs. & Doe Rule 56.1 Stmt. ¶ 77.)  The parties have not supplemented this record to inform the Court of the result of that hearing, although according to the inmate records at Mid-Orange Correctional Facility, it appears that Doe was denied parole in August 205 and scheduled to re-appear before the Parole Board in August 2007.

**Doe's Physical Condition**

Defendants emphasize that Doe has "repeatedly denied that he is an addict to medical doctors and nurses and tells them that he has not taken drugs since the 1970's." (Defs. Rule 56.1 Stmt. ¶ 66; Doe Dep. at 31-34.) Doe, on the other hand, explains that "denial" is "one of the [major] symptoms of the disease of substance dependence." (Doe Rule 56.1 Stmt. ¶ 66; Doe Dep. at 31, 34.) Doe has not denied his drug addiction to DOCS counselors, only to DOCS medical personnel. (Doe Dep. at 34-36, 76-77.) The counselors' comments on Doe's ASAT certifications as to whether he was in a state of denial or acceptance of his addiction indicate that he was in "acceptance" in 1994 and that he had "gained significantly in understanding and accepting the negative consequences of drugs in his life" in 1995. (Doe Rule 56.1 Stmt. Ex. D: 1995 Certificate of Recognition at 975 & 1994 ASAT Discharge Evaluation at 977; see also id. Ex. C: 1992 Intake Interview at 1085: "[Doe] admits to alcohol and heroin abuse and is amenable to counseling.") The document Doe submitted to explain the condition of denial explains it as an unconscious process. (Doe Rule 56.1 Stmt. Ex. D at 5-7: "Role of Denial in Chemical Dependency"; id. at 85-87.)

Asthma is the only medical condition for which Doe currently receives medication and treatment. (Defs. & Doe Rule 56.1 Stmt. ¶¶ 71, 72; Doe Dep. at 68, 82.) Doe was diagnosed with Hepatitis C in 1999 and was treated for it until 2001. (Doe Dep. at 69.) He currently takes vitamins for the Hepatitis C. (Defs. & Doe Rule 56.1 Stmt. ¶ 72; Doe Dep. at 82.)

Doe has not suffered withdrawal symptoms – "sweating, headaches, cold shakes, all of that," as Doe defined it – since his arrest on his current conviction and perhaps for a couple of years after that. (Defs. & Doe Rule 56.1 Stmt. ¶ 72; Doe Dep. at 80-82.)

Doe asserts that "[d]efendants' failure to provide Doe with comprehensive substance abuse care poses a grave and substantial risk that he will relapse to drug use again, as he did on three prior occasions [when released from prison], and exacerbate his documented condition of liver disease to the point of fatality." (Doe Rule 56.1 Stmt. ¶ 78; see Doe Dep. at 147.)[15]

**Doe's Access to Medical Doctors and Treatment Personnel**

No defendant has ever prevented Doe from seeing a DOCS doctor. (Defs. Rule 56.1 Stmt. ¶ 66; Doe Dep. at 140.) Doe asserts that DOCS medical personnel are not trained in substance abuse treatment and do not provide care for substance dependence. (Doe Rule 56.1 Stmt. ¶¶ 65, 68; Doe Dep. at 65.) Doe seeks access to addiction treatment specialists. (Doe Dep. at 65, 113.) Doe asserts that he was told to address all addiction problems to the guidance and counseling unit. (Doe Rule 56.1 Stmt. ¶¶ 65, 68 & Ex. C at 7-10: DOCS Directive 4401, "Guidance & Counseling Services"; Doe Dep. at 35-36, 68, 73.)[16] According to DOCS, "[w]hether substance dependence is a medical issue requiring medical care depends on whether the inmate manifests symptoms which require medical care. . . . [such as] symptoms of withdrawal. . . . An inmate's potential for recidivism,

---

[15]   Doe's only evidence of liver disease is the hepatitis C for which he testified he no longer receives treatment. (See Doe Dep. at 69.)

[16]   (See Doe Rule 56.1 Stmt. Ex. C at 11: 7/8/05 Guidance and Counseling Center Memo from Corrections Counselor Allen to Doe:  ASAT staff screen inmates for that program; "Medical doesn't make the decision as to your suitability for the ASAT Program.")

however, is generally not a medical issue."  (Schulman Aff. Ex. L: DOCS Supp. Discovery Resp. No. 18.)

According to Doe, OASAS has addiction treatment specialists.  (Doe Dep. at 73, 139.)

Doe testified that he may have spoken to an OMH counselor once but that he never applied for admission into an OMH program because those programs are not designed to treat addiction, rather they are addressed to mentally ill inmates.  (Defs. Rule 56.1 Stmt. ¶ 69; Doe Dep. at 41-42, 78-79, 115-19.)

Doe contends that "substance abuse is the only disability" for which a prisoner is "denied access to comprehensive care because he has a history of violence and recidivism."  (Doe Dep. at 102.)  According to Doe, if he were blind, DOCS would transfer him to a facility where he could get treatment for his disability irrespective of his violent history.  (Id.)  Doe's "ideal" program would be for OASAS to establish a program within DOCS facilities comparable to what the OMH and the Office of the Developmentally Disabled have done.  (Doe Dep. at 119, 134.)

Doe claims that his inability "to remain in a working society" is evidence that his addiction limits a "major life activit[y]."  (Doe Dep. at 135.)

**Defendants DOCS and OASAS**

"Defendant DOCS is an agency of the State of New York organized under the Corrections Law of the State of New York to have responsibility for the custody and care of inmates committed to imprisonment."  (Defs. & Doe Rule 56.1 Stmt. ¶ 3.)  OASAS is an agency of the State

of New York organized under Article 19 of the Mental Hygiene Law of New York. (<u>See</u> Defs. Rule 56.1 Stmt. ¶ 4.) Doe maintains that OASAS is the "primary agency addressing issues of addiction for the State of New York" and has the authority to oversee the drug addiction rehabilitation care given to inmates in DOCS custody. (Doe Rule 56.1 Stmt. ¶ 4; Doe Rule 56.1 Stmt. Ex. D at 1411: Cunningham Aff. ¶ 8.) Defendants concede that OASAS provides DOCS grant money for certain programs. (Defs. & Doe Rule 56.1 Stmt. ¶ 58.) Defendants contend that OASAS neither provides substance abuse services at DOCS facilities nor does it have any jurisdiction or oversight responsibility over DOCS. (Defs. Rule 56.1 Stmt. ¶ 58; Dkt. No. 45: OASAS Discovery Resp. Nos. 5, 7, 11.) OASAS does certify the Willard Drug Treatment Center but DOCS operates the facility. (Dkt. No. 45: OASAS Discovery Resp. Nos. 11-12.) Doe acknowledged at his deposition that OASAS does not have a presence in DOCS, but that the Office of Mental Health ("OMH"), which deals with the mentally ill and developmentally disabled, does. (Doe Dep. at 117-19.)

## ANALYSIS

I.   **SUMMARY JUDGMENT STANDARDS IN SECTION 1983 CASES[17]**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may

---

[17]   For additional decisions by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, see, e.g., Dawkins v. Jones, No. 03 Civ. 0068, 2005 WL 196537 at *9-10 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); Hall v. Perilli, 03 Civ. 4635, 2004 WL 1068045 at *3 (S.D.N.Y. May 13, 2004) (Peck, M.J.); Baker v. Welch, 03 Civ. 2267, 2003 WL 22901051 at *4-6 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.); Muhammad v. Pico, 02 Civ. 1052, 2003 WL 21792158 at *10-11 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.) (citing prior Opinions); Carbonell v. Goord, 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); Greenfield v. City of New York, 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); Salahuddin v. Coughlin, 999 F. Supp. 526, 534 (S.D.N.Y. 1998) (Rakoff, D.J. & Peck, M.J.); Watson v. McGinnis, 981 F. Supp. 815, 817 (S.D.N.Y. 1997) (Kaplan, D.J. & Peck, M.J.).

discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

       To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356.

       In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513; see also, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. United States Fire Ins. Co., 804 F.2d at 11-12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Doe and that "pro se parties are to be given special latitude on summary judgment motions." Salahuddin v. Coughlin, 999 F. Supp. at 535 (citations & internal quotations omitted); see, e.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be read liberally and interpreted "'to raise the strongest arguments that they suggest'").[18]  Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment.  See, e.g., Irby v. New York City Transit Auth., 262 F.3d 412, 413-

---

[18]  See also, e.g., Commer v. American Fed'n of State, County & Mun. Employees, 272 F. Supp. 2d 332, 335 (S.D.N.Y. 2003) ("[T]he Court is mindful that the plaintiff is proceeding pro se and that his submissions should be held to 'less stringent standards than formal pleadings drafted by lawyers. . . .'"), aff'd, 390 F.3d 203 (2d Cir. 2004); Douglas v. Portuondo, 232 F. Supp. 2d 106, 113 (S.D.N.Y. 2002).

14 (2d Cir. 2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56. . . . [E]ither the district court or the moving party is to supply the pro se litigant with notice of the requirements of Rule 56. . . . In the absence of such notice or a clear understanding by the pro se litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."); McPherson v. Coombe, 174 F.3d at 280-81 ("'[t]he failure of a district court to apprise pro se litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.'") (citations omitted).[19/]  Defendants here served the appropriate notices on Doe.  (Dkt. No. 44: Defs. Rule 56.2 Notice.)

"Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  Cole v. Artuz, 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases); see also, e.g., Viruet v. Citizen Advice Bureau, 01 Civ. 4594, 2002 WL 1880731 at *9 (S.D.N.Y. Aug 15, 2002) (Peck, M.J.); Smith v. Planas, 975 F. Supp. 303, 305 n.2 (S.D.N.Y. 1997).

---

[19/]     See also, e.g., Trammell v. Coombe, No. 97-2622, 201 F.3d 432 (table), 1999 WL 1295856 at *2 (2d Cir. Dec. 23, 1999); Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir. 1999); Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996); see generally S.D.N.Y. Local Civil Rule 56.2 (requiring service of notice explaining the requirements of Rule 56 on litigant proceeding pro se).

## II.   DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON DOE'S § 1983 EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), cert. denied, 512 U.S. 1240, 114 S. Ct. 2749 (1994).

### A.   Legal Standards Governing Eighth Amendment Deliberate Indifference to Serious Medical Needs Claims[20]

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency."  E.g., Hudson v. McMillan, 503 U.S. 1, 5, 8, 112 S. Ct. 995, 998, 1000 (1992); Wilson v. Seiter, 501 U.S. 294, 297, 308, 111 S. Ct. 2321, 2323, 2329

---

[20]   For additional decisions by this Judge discussing the governing standard in medical indifference claims, in language substantially similar to that in this entire section of this Report and Recommendation, see, e.g., Dawkins v. Jones, 03 Civ. 0068, 2005 WL 196537 at *13-15 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); Doe v. Goord, 04 Civ. 0570, 2004 WL 2829876 at *12-13 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); Hall v. Perilli, 03 Civ. 4635, 2004 WL 1068045 at *4-7 (S.D.N.Y. May 13, 2004) (Peck, M.J.); Nelson v. Rodas, 01 Civ. 7887, 2002 WL 31075804 at *10-13 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.); Espinal v. Goord, 00 Civ. 2242, 2001 WL 476070 at *7-10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); Fulmore v. Mamis, 00 Civ. 2831, 2001 WL 417119 at *7-8 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); Freeman v. Strack, 99 Civ. 9878, 2000 WL 1459782 at *5-6 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); Culp v. Koenigsmann, 99 Civ. 9557, 2000 WL 995495 at *6-7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); Carbonell v. Goord, 99 Civ. 3208, 2000 WL 760751 at *5-6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

(1991); <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. 97, 102, 104-05, 97 S. Ct. 285, 290, 291 (1976); <u>Gregg</u> v. <u>Georgia</u>, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925 (1976).

   To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. <u>E.g.</u>, <u>Helling</u> v. <u>McKinney</u>, 509 U.S. 25, 32, 113 S. Ct. 2475, 2480 (1993); <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. at 104-05, 97 S. Ct. at 291.[21]

   As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." <u>Hathaway</u> v. <u>Coughlin</u>, 99 F.3d 550, 553 (2d Cir. 1996).[22] "Objectively, the alleged deprivation must be 'sufficiently serious.'" <u>Hathaway</u> v. <u>Coughlin</u>, 99 F.3d at 553; <u>see</u>, <u>e.g.</u>, <u>Hudson</u> v. <u>McMillian</u>, 503 U.S. at 9, 112 S. Ct. at 1000 ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious'"); <u>Smith</u> v. <u>Carpenter</u>, 316 F.3d at 183-84 ("The objective "medical need' element measures the severity of the alleged deprivation . . .").[23] "'The Constitution does not command that inmates be given the kind

---

[21] See also, <u>e.g.</u>, <u>Smith</u> v. <u>Carpenter</u>, 316 F.3d 178, 183 (2d Cir. 2003); <u>Selby</u> v. <u>Coombe</u>, No. 00-172, 17 Fed. Appx. 36 (table), 2001 WL 964195 at *1 (2d Cir. Aug. 20, 2001) (citing <u>Chance</u> v. <u>Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998)); <u>Perkins</u> v. <u>Obey</u>, 00 Civ. 1691, 2004 WL 238036 at *8 (S.D.N.Y. Feb. 10, 2004).

[22] Accord, <u>e.g.</u>, <u>Smith</u> v. <u>Carpenter</u>, 316 F.3d at 183; <u>Selby</u> v. <u>Coombe</u>, 2001 WL 964195 at *1; <u>Chance</u> v. <u>Armstrong</u>, 143 F.3d at 702.

[23] See also, <u>e.g.</u>, <u>Selby</u> v. <u>Coombe</u>, 2001 WL 964195 at *1; <u>Chance</u> v. <u>Armstrong</u>, 143 F.3d at 702; <u>Lumaj</u> v. <u>Williams</u>, 03 Civ. 1849, 2004 WL 1207894 at *4 (S.D.N.Y. June 2, 2004); <u>Torres</u> v. <u>Mazzuca</u>, 246 F. Supp. 2d 334, 339 (S.D.N.Y. 2003).

of medical attention that judges would wish to have for themselves . . . .'" Dean v. Coughlin, 804

F.2d 207, 215 (2d Cir. 1986).  "[O]nly those deprivations denying 'the minimal civilized measure

of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."

Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991) (citation omitted); see also, e.g.,

Dean v. Coughlin, 804 F.2d at 215 ("'[T]he essential test is one of medical necessity and not one

simply of desirability.'"). Thus, Eighth Amendment protection is limited to "'a condition of urgency'

that may result in 'degeneration' or 'extreme pain.'" Chance v. Armstrong, 143 F.3d at 702;[24/] accord,

e.g., Morales v. Mackalm, 278 F.3d 126, 132 (2d Cir. 2002); Harrison v. Barkley, 219 F.3d 132, 136

(2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition

could result in further significant injury or the unnecessary and wanton infliction of pain.'").

      "Subjectively, the charged official must act with a sufficiently culpable state of mind."

Hathaway v. Coughlin, 99 F.3d at 553; accord, e.g., Smith v. Carpenter, 316 F.3d at 184 ("[T]he

subjective 'deliberate indifference' element ensures that the defendant prison official acted with a

sufficiently culpable state of mind."); Selby v. Coombe, 2001 WL 964195 at *1; Chance v.

Armstrong, 143 F.3d at 702. "The required state of mind, equivalent to criminal recklessness, is that

the official "'knows of and disregards an excessive risk to inmate health or safety;  the official must

both be aware of facts from which the inference could be drawn that a substantial risk of serious

---

[24/]    The Second Circuit in Chance v. Armstrong identified several factors that are relevant in
determining whether a serious medical condition exists, including "'[t]he existence of an
injury that a reasonable doctor or patient would find important and worthy of comment or
treatment; the presence of a medical condition that significantly affects an individual's daily
activities; or the existence of chronic and substantial pain.'"  143 F. 3d at 702.

harm exists, and he must also draw the inference.'"" <u>Hemmings</u> v. <u>Gorczyk</u>, 134 F.3d 104, 108 (2d

Cir. 1998) (quoting <u>Hathaway</u> v. <u>Coughlin</u>, 99 F.3d at 553 (quoting <u>Farmer</u> v. <u>Brennan</u>, 511 U.S.

825, 837, 114 S. Ct. 1970, 1979 (1994))).<u>25/</u>

    Deliberate indifference may be "manifested by prison doctors in their response to the

prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to

medical care." <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. at 104-05, 97 S. Ct. at 291 (fn. omitted); <u>accord</u>, <u>e.g.</u>,

<u>Kaminsky</u> v. <u>Rosenblum</u>, 929 F.2d 922, 926 (2d Cir. 1991) ("Cruel and unusual punishment may

consist of prison officials delaying an inmate access to needed medical care.").<u>26/</u> However, an

"inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference."

<u>Estelle</u> v. <u>Gamble</u>, 429 U.S. at 105-06, 97 S. Ct. at 292; <u>accord</u>, <u>e.g.</u>, <u>Burton</u> v. <u>New York State Dep't</u>

<u>of Corr.</u>, 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 2, 1994) (Sotomayor, D.J.). "Thus,

a complaint that a physician has been negligent in diagnosing or treating a medical condition does

not state a valid claim . . . under the Eighth Amendment." <u>Estelle</u> v. <u>Gamble</u>, 429 U.S. at 106, 97

---

<u>25/</u>  <u>See also</u>, <u>e.g.</u>,  <u>Smith</u> v. <u>Carpenter</u>, 316 F.3d at 184; <u>Selby</u> v. <u>Coombe</u>, 2001 WL 964195 at
   *1; <u>Chance</u> v. <u>Armstrong</u>, 143 F.3d at 702; <u>LaBounty</u> v. <u>Coughlin</u>, 137 F.3d 68, 72-73 (2d
   Cir. 1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the
   acts of defendants involved more than lack of due care, but rather involved obduracy and
   wantonness in placing his health in danger.");  <u>Lumaj</u> v. <u>Williams</u>, 2004 WL 1207894 at *5.

<u>26/</u>  <u>See</u>, <u>e.g.</u>,  <u>Hathaway</u> v. <u>Coughlin</u>, 37 F.3d 63, 67 (2d Cir. 1994) (delay for more than two
   years in removing broken pins from prisoner's hip despite nearly seventy complaints of pain),
   <u>cert. denied</u>, 513 U.S. 1154, 115 S. Ct. 1108 (1995); <u>Liscio</u> v. <u>Warren</u>, 901 F.2d 274, 277 (2d
   Cir. 1990) (failure to provide medical attention to a delirious inmate for three days); <u>Archer</u>
   v. <u>Dutcher</u>, 733 F.2d 14, 15-17 (2d Cir. 1984) (denying summary judgment where plaintiff
   "identifie[d] intentional efforts on the part of defendants to delay her access to medical care
   at a time [when] she was in extreme pain"); <u>Williams</u> v. <u>Vincent</u>, 508 F.2d 541, 544 (2d Cir.
   1974).

S. Ct. at 292.[27/]   As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. at 106, 97 S. Ct. at 292; accord, e.g., Smith v. Carpenter, 316 F.3d a 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims,  nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); Hathaway v. Coughlin, 99 F.3d at 553; Burton v. New York State Dep't of Corr., 1994 WL 97164 at *2.

An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" Chance v. Armstrong, 143 F.3d at 703 (quoting Hathaway v. Coughlin, 99 F.3d at 553); Harrison v. Barkley, 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment violation. . . . This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady. . . . [But] [c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.'"); Hathaway v. Coughlin, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

---

[27/]   Accord, e.g., Hathaway v. Coughlin, 99 F.3d at 553; Felipe v. New York State Dep't of Corr. Servs., No. 95-CV-1735, 1998 WL 178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance v. Armstrong, 143 F.3d at 703; accord, e.g., Hathaway v. Coughlin, 37 F.3d at 70 (Jacobs, C.J., dissenting) ("'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.'"); Culp v. Koenigsmann, 2000 WL 995495 at *7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); see also, e.g., Troy v. Kuhlmann, 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct. 15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); Brown v. Selwin, 250 F. Supp. 2d 299, 308 (S.D.N.Y. 1999) (citing cases), aff'd, No. 01-0144, 29 Fed. Appx. 762, 2002 WL 355901 (2d Cir. Mar. 6, 2002); Negron v. Macomber, 95 Civ. 4151, 1999 WL 608777 at *6 (S.D.N.Y. Aug. 11, 1999); Espinal v. Coughlin, 98 Civ. 2579, 1999 WL 387435 at *3 (S.D.N.Y. June 14, 1999).[28/]

---

[28/]   Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

> Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover,

"Just as the relevant 'medical need' can only be identified in relation to the specific
factual context of each case, the severity of the alleged denial of medical care should be analyzed
with regard to all relevant facts and circumstances.  The absence of adverse medical effects or
demonstrable physical injury is one such factor that may be used to gauge the severity of the medical
need at issue.  Indeed, in most cases the actual medical consequences that flow from the alleged
denial of care will be highly relevant to the question of whether the denial of treatment subjected the
prisoner to a significant risk of serious harm."   Smith v. Carpenter, 316 F.3d at 187 (citations
omitted).

---

any delay in treatment in this case does not rise to the egregious level identified in
Hathaway.  That [plaintiff] feels something more should have been done to treat his
injuries is not a sufficient basis for a deliberate indifference claim.

Demata v. New York State Corr. Dep't of Health Servs., No. 99-0066, 198 F. 3d 233 (table),
1999 WL 753142 at *2 (2d Cir. Sept. 17, 1999) (citations omitted) (summary judgment for
defendants where plaintiff complained of knee injury in February 1994 and surgery not
performed until March 1997); accord, e.g., Smith v. Carpenter, 316 F.3d at 185 ("When the
basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the
provision of otherwise adequate medical treatment, it is appropriate to focus on the
challenged delay or interruption in treatment rather than the person's underlying medical
condition alone in analyzing whether the alleged deprivation is, in 'objective terms,
sufficiently serious,' to support an Eighth Amendment claim.") (emphasis in original);
Freeman v. Strack, 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who
scheduled inmate with appendicitis requiring appendectomy for appointment two hours later
rather than seeing inmate immediately where "[t]here was nothing in [the inmate]'s medical
history which would have put [the nurse] on notice that [plaintiff] was suffering from the
onset of appendicitis . . . and there is no evidence that [the officer] gave [the nurse] any
reason to believe that there was an emergency on hand"); Culp v. Koenigsmann, 2000 WL
995495 at *7-8 (rejecting claim based on fact that one doctor recommended arthroscopic
surgery for knee injury in April 1999, while another doctor concluded that surgery was not
warranted until more conservative measures like physical therapy had been tried and failed).

**B.**     **Doe's Injuries Are Not Sufficiently Serious As a Matter of Law**

Doe claims that deprivation of "comprehensive substance abuse care poses a grave and substantial risk of current and future harm that he will relapse to drug addiction and resulting criminal activity, and exacerbate his liver condition to the point of fatality." (Dkt. No. 49: Doe Br. at 8.) Defendants contend that Doe cannot sustain an Eighth Amendment claim because Doe has not taken drugs for fourteen years while incarcerated and therefore does not suffer from a health problem "sufficiently grave to implicate the Constitution." (Dkt. No. 43: Defs. Br. at 11.) Moreover, defendants assert that Doe's claim that there is a risk of him reverting back to drug use upon his release "is purely speculative" and that since Doe does not have a conditional release date, he may never be confronted with the issue of life outside of jail. (Id. at 12-13.)

The present injuries that Doe alleges are not objectively sufficiently serious to state an Eighth Amendment claim. Doe claims that he suffers from "denial," which he asserts is a symptom of drug addiction. (See page 15 above.) However, the very documents that Doe submitted in support of this claim belie the fact that he is suffering from denial: First, the fact that he so vigorously seeks treatment through the instant actions shows he is well-aware of any past and present addiction, whereas the document Doe submitted to explain denial defines it as an unconscious process (see page 15 above); second, the counselors' comments on Doe's ASAT certifications as to whether he was in a state of denial or acceptance of his addiction indicate that he was in "acceptance" in 1994 and that he had "gained significantly in understanding and accepting the negative consequences of drugs in his life" in 1995 (see page 15 above). In any event, Doe does not claim

that denial itself is a serious medical condition; rather, he uses that as proof that he suffers from drug addiction (and to explain away statements he made to DOCS' doctors that he finds unhelpful in this context). As discussed below, Doe has received treatment for his drug addiction while incarcerated; his complaint is that he wants additional treatment through CASAT or a similar program when he is released to avoid future harm.

Doe also claims that the "failure to provide . . . comprehensive substance abuse care . . . [will] exacerbate his documented condition of liver disease to the point of fatality." (Dkt. No. 48: Doe Rule 56.1 Stmt. ¶ 78; see also Doe Br. at 8.) However, the only documentation of his liver disease Doe provides merely stated that he has "mild chronic active hepatitis." (Doe Rule 56.1 Stmt. Ex. C: Dep't of Pathology & Lab. Medicine 6/13/00 Surgical Pathology Report at 758; see Doe Rule 56.1 Stmt. Ex. C: Burke Rehabilitation Hospital 12/13/00 Report of Examination at 630.) This report was made in 2000 and Doe testified that he no longer receives treatment for his Hepatitis beyond the vitamins he takes. (See page 15 above.) Doe has not produced any evidence that would tend to show there is a danger that his condition will worsen without appropriate comprehensive substance abuse treatment. Moreover, he is not seeking treatment for a liver condition, but rather drug addiction treatment to prevent his drug use if released, which could exacerbate any pre-existing liver problems. Again, the issue is future harm.

A risk of future harm is actionable under the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 33-36, 113 S. Ct. 2475, 2480-82 (1993) (exposure to second hand smoke); Warren v. Keane, 196 F.3d 330, 332-33 (2d Cir. 1999) (same). Determining whether "conditions

of confinement violate the Eighth Amendment requires "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by the exposure to [the harmful condition]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." Helling v. McKinney, 509 U.S. at 36, 113 S. Ct. at 2482. The threatened health problems must be "'sufficiently imminent' and 'sure or very likely to cause serious illness and needless suffering in the next week or month or year.'" Atkins v. County of Orange, 372 F. Supp. 2d 377, 408 (S.D.N.Y. 2005).

Doe's conclusory reliance on his past relapses into drug use after his previous prison terms as proof that he might relapse upon a theoretical release on parole is insufficient as a matter of law to state an objectively serious medical need. See Atkins v. County of Orange, 372 F. Supp. 2d at 410-11 (To survive summary judgment, plaintiffs "'must do more than make broad factual allegations and invoke the appropriate statute.'"); Nunes v. Artuz, 01 Civ. 1141, 2003 WL 22952743 at *7 (S.D.N.Y. Dec. 12, 2003) ("Plaintiffs have failed to provide any evidence to support their conclusory allegations that they face an increased risk of future injury" from alleged asbestos exposure.)

Put another way, Doe is complaining that although the medical care (including counseling) that he has received in prison is adequate while he is in prison, he needs to receive

additional comprehensive counseling once he is released to avoid recidivism.  If Doe were suffering from cancer, and was treated appropriately while in prison so that his cancer went into remission, would he be entitled to future long-term treatment once released from prison to treat any recurrence of his cancer?  The Court believes he would not – and the same result is applicable to drug addiction counseling.  While it no doubt would be beneficial (as would finding jobs and housing for released inmates, etc.), it is not constitutionally required, and denial is not a deprivation of Eighth Amendment (or any other Constitutional) rights.  Government resources are scarce, and if DOCS decides not to make CASAT's work-release and further counseling services available to violent recidivists, the Eighth Amendment does not require otherwise.

Because Doe has failed to show an issue of material fact as to the seriousness of his present or future injuries, he is unable to satisfy the objective prong of the deliberate indifference test.

**C.    Doe Fails To Raise An Issue of Material Fact for the Subjective Prong of the Deliberate Indifference Test**

Even if Doe could show a sufficiently serious deprivation under the objective prong of the deliberate indifference test, Doe fails to raise an issue of material fact as to the subjective prong.  Doe claims that the supervisory defendants – DOCS, OASAS, Goord, Gorman and Nuttall – were deliberately indifferent to his serious medical need of comprehensive substance abuse treatment by establishing "an unconstitutional policy which deprives Doe of requisite comprehensive substance abuse care."  (Dkt. No. 49: Doe Br. at 23.)  However, disagreement over the proper treatment does not rise to the level of a constitutional violation.  (See cases cited on page 28 above.)

Doe was provided with and has participated in the NA, AA and ASAT programs while incarcerated. (See pages 4, 6 above.) Doe has received treatment, albeit not the treatment he desires, and therefore cannot prove that the supervisory defendants have violated his Eighth Amendment rights.

The First Circuit's decision in Fiallo v. Batista, 666 F.2d 729 (1st Cir. 1981), is directly on point. In that case, inmate plaintiff Fiallo "suffer[ed] from drug addiction" and "received tratment in institutional programs at the prisons where he was incarcerated. Desiring more comprehensive therapy, he sought to be transferred to a residential drug treatment facility." Fiallo v. Batista, 666 F.2d at 730. Prison authorities denied his request "in light of plaintiff's chronic addiction problems and anti-social personality traits," and also his "'past criminal history [and] nature of crimes.'" Id. The First Circuit affirmed the district court's dismissal of the case, stating:

> Plaintiff's specific claim is that he has a right to receive treatment for his drug addiction at the residential facility operated by the Department of Addiction Services. Plaintiff's argument casts this right in two alternative forms: as part of a general constitutional right to rehabilitation and as a liberty interest protected by the due process clause. Accepting all of plaintiff's factual allegations as true, we are unable to find that he has been deprived of any constitutional right.

> We are unaware of any authority for the proposition that a prison inmate has a federal constitutional right to rehabilitation. Indeed, all indications appear to be to the contrary. . . .

> The substantive federal right most closely implicated by plaintiff's allegations is the Eighth Amendment right not to be denied necessary medical treatment, a right which encompasses drug addiction therapy. The facts of plaintiff's case, however, fall far short of stating an Eighth Amendment claim. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 29 U.S. 97, 106, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976). Here plaintiff clearly does not allege deprivation of essential treatment or indifference to serious needs, only that he has not received the type of treatment which he desires.

Fiallo v. Batista, 666 F.2d at 730-31 (fns. & citations omitted, emphasis added); see, e.g., United States v. Billiot, No. ACM34878, 2003 WL 22271225 at *6 (A.F. Ct. Crim. App. Sept. 26, 2003) ("There is no constitutional right to drug rehabilitation. Drug addiction therapy can fall in the category of necessary medical treatment, but only when denial of such treatment is sufficiently harmful to satisfy the deliberate indifference standard. It is not enough that an accused merely wants a certain type of treatment. In this case, the appellant did receive treatment and counseling under the base Alcohol and Drug Abuse Prevention and Treatment Program . . . while in pretrial confinement. Accordingly, the facts of this case do not support the appellant's assertion of deliberate indifference.") (internal citations to Fiallo v. Batista, 666 F.2d at 730-31 omitted), review denied, 59 M.J. 474 (U.S.A.F. Apr. 29, 2004).[29]

Doe has spent the majority of his adult life behind prison bars. In those few years he has spent at liberty, he has engaged in a life of crime and drugs. While in prison, among other accomplishments, he has obtained his masters in theology and has been an inmate facilitator in the

---

[29] See also, e.g., May v. Meloy, No. 97-2251, 182 F.3d 922 (table), 1999 WL 401675 at *1 (7th Cir. June 9, 1999) (summary judgment for defendant correctional officials affirmed where plaintiff disagreed with the psychological counseling classification he received and desired different psychological and counseling treatment than that he was provided); Bonds v. Rutt, No. 3:05-CV-604, 2005 WL 2591891 at *2 (N.D. Ind. Oct. 12, 2005) ("The Eighth Amendment does not require successful medical treatment nor even reasonable treatment, it merely prohibits wanting harm to come to a prisoner," where plaintiff alleged that he was prescribed the same psychiatric medication in the same dosage as had been prescribed before his arrest which treatment he claims allowed him to commit an assault.); Pool v. Peters, No. 92 C 1600, 1993 WL 222360 at *3 (N.D. Ill. June 22, 1993) (holding "an inmate does not have the right to choose his treatment" where plaintiff wanted more psychiatric care than he had been provided and had filed "numerous grievances complaining about the inadequacy of his care . . . [and sought] counseling on a more regular, long-term basis" and a different medication prescribed.).

ASAT program.  (See page 5 above.)  While Doe is unsatisfied with the drug treatment he has

received while in prison and, as a result, feels unprepared for a life outside the confines of his jail

cell, the Eighth Amendment does not give Doe the right to the drug treatment of his choice.

As to the individual defendants who are corrections counselors, while Doe alleges

that they suggested he request CASAT knowing he was ineligible for such a program, or that they

"intentionally mischaracterized" his requests for CASAT or deemed him not "time-eligible" for

CASAT at times that he was in fact eligible (see Doe Br. at 18, 20), Doe does not refer to any

condition which would put the counselors on notice of a serious risk of harm.  Doe's evidence does

not as a matter of law show the requisite intent by any corrections counselor necessary to sustain a

deliberate indifference claim  (see cases cited at pages 25-28 above) – particularly since Doe has

been found ineligible for CASAT once his application was processed.[30]

---

[30]     Defendants assert that Doe cannot claim a constitutional right to rehabilitation.  (Defs. Br.
at 17-18.)  The case law supports that proposition.  See, e.g., Smith v. Follette, 445 F.2d 955,
961 (2d Cir. 1971) ("The claim to a constitutional right to treatment for narcotics addiction
has no basis in either the provisions of the Constitution or the decisions of the courts, and we
need not give it serious consideration."); Gill v. United States Parole Comm'n, 692 F. Supp.
623, 628 (E.D. Va. 1988) ("Inmates have no constitutional right to any rehabilitation
treatment or programs such as the drug program sought here.") (citing Fredericks v. Huggins,
711 F.2d 31 (4th Cir. 1983))   However, Doe is not claiming a stand-alone constitutional
right to drug rehabilitation, but rather is claiming an Eighth Amendment violation for failure
to provide the treatment he deems appropriate.  It is under the Eighth Amendment standard
that this Court has reviewed Doe's claim.

### III.   DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON DOE'S § 1983 CLAIM ALLEGING A VIOLATION OF DOE'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION

The equal protection clause of the Fourteenth Amendment protects "'every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" Vill. of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 1075 (2000).  An individual claiming a violation of the equal protection clause must be able to prove that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook, v. Olech, 528 U.S. at 564, 120 S. Ct. at 1074.[31/]

Thus, a state agency's decision to act on the basis of one's differences does not give rise to a constitutional violation if "'there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356, 367, 121 S. Ct. 955, 964 (2001); see NYC C.L.A.S.H., Inc. v. City of New York, 315 F. Supp. 2d 461, 482, 492 (S.D.N.Y. 2004).  The burden is "upon the challenging party to negative "'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Bd. of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. at 367, 121 S. Ct. at 964.

Doe claims that the defendants "provide him with fewer and less comparable comprehensive mental health services than are provided[] by the OMH to mentally ill prisoners."

---

[31/]     See, e.g., Bizzaro v. Miranda, 394 F.3d 82, 88 (2d Cir. 2005); Rivera v. City of New York, 00 Civ. 3149, ___ F. Supp. 2d ___, 2005 WL 2509687 at *9 (S.D.N.Y. Oct. 11, 2005); Gillum v. Nassau Downs Reg'l Off Track Betting Corp., 357 F. Supp. 2d 564, 570-71 (E.D.N.Y. 2005).

(Dkt. No. 49: Doe Br. at 24.)[32/]   According to Doe, he is denied comprehensive substance abuse treatment for non-medical reasons – history of violence and recidivism – whereas other disabled prisoners under OMH's care are provided care irrespective of security status. (See page 17 above.) Specifically, Doe explains that it is not admission into CASAT per se that he seeks but rather "access to comprehensive substance abuse care which provides a continuum of intensive therapy in a facility setting, followed by a transitional period in a community reintegration component. This two-phase model provides the sustained support and service necessary for successful community reintegration that is [not] provided in ASAT, RSAT,  AA, NA, or other single-phase treatment programs."  (Dkt. No. 48: Doe Rule 56.1 Stmt. ¶ 68; see Doe Br. at 25.)

Even if Doe could establish that DOCS intentionally treats similarly situated mentally ill inmates differently than him,[33/] he must show that such differential treatment is not rationally related to a legitimate governmental purpose.  In the context of equal protection claims, "'prison

---

[32/]   Doe relies on section 1.03(3) of the New York State Mental Hygiene Law for his assertion that he is mentally disabled.  (See Dkt. No. 21: 2d Am. Compl. ¶ 16.)  Section 1.03(3) provides that:  "'Mental disability' means mental illness, mental retardation, developmental disability, alcoholism, substance dependence, or chemical dependence."

[33/]   While Doe claims DOCS provides such services to other mentally disabled prisoners regardless of criminal history (Doe Rule 56.1 Stmt. ¶ 70), he does not provide evidence of such comparable care.  Doe cites to the "New York State Department of Correctional Services Division of Health Services Policy," but only provides the table of contents which does not support his claim.  (See Doe Rule 56.1 Stmt. Ex. C at 23-26.)  Doe refers to the Willard treatment facility as "the only existing DOCS facility that provides licensed certified care" (Doe Br. at 25), but he has failed to offer evidence that the criteria for those housed in that facility did not include criminal history.  (See Doe Rule 56.1 Stmt. Ex. D at 1009: "Willard Drug Treatment Campus Setting.")  Doe has not demonstrated that DOCS treats other mentally disabled inmates differently with regard to criminal history.

administrators, when making classifications need only demonstrate a rational basis for their distinctions,' . . . or that they are 'reasonably related to legitimate penological interests.'" Isaraphanich v. Coughlin, 716 F. Supp. 119, 121 (S.D.N.Y. 1989) ("Denying inmates participation in the . . . [Temporary Release Program] on the basis of an outstanding INS detainer is rationally related to the legitimate penological interest of preventing participating inmates from escaping upon release.").

Defendants argue that "the state may deny participation in programs because of disabilities so long as there are reasonably conceivable facts which provide a rational basis for doing so." (Dkt. No. 43: Defs. Br. at 19.)  According to defendants, denial of admission to CASAT – "a work release-like program" – because of Doe's criminal history is a reasonably conceivable basis for the distinction. (Defs. Br. at 19, 23.)  DOCS' regulations governing the procedures for considering inmates for temporary release programs require the officials to consider the criminal history of the applicant as a factor in the review process.  See 7 NYCRR §§ 1900.4(e)(1), 1951.2(b).  Defendants posit that criminal history is a factor "for the obvious reason that a lengthy criminal history increases the likelihood that placement in a community setting will result in more crimes." (Defs. Br. at 19.) Indeed, Executive Order 5.1 prevents DOCS from admitting violent offenders into temporary release programs.  9 NYCRR § 5.5; see page 7 above.  The safety of the community is certainly a reasonably conceivable state interest in excluding violent recidivist offenders from participation in any program which includes a temporary release component.  Indeed, Doe recognized that this was a legitimate state interest in his deposition.  (See Doe Dep. at 113, discussed at page 12 above.)  Doe has not set

forth material facts which can overcome the rational basis of DOCS' policy.  His Equal Protection claim should be denied.

## IV.  DEFENDANTS SHOULD BE GRANTED SUMMARY JUDGMENT ON DOE'S ADA[34] AND REHABILITATION ACT CLAIMS

To prove a violation of Title II of the ADA,[35] a plaintiff must demonstrate:  "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability."  Hargrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003); K.M. v. Hyde Park Cent. Sch. Dist., 381 F. Supp. 2d 343, 357-58 (S.D.N.Y. 2005); Blatch v. Hernandez, 360 F. Supp. 2d 595, 629 (S.D.N.Y. 2005).  Since "[t]hese requirements apply with equal force to plaintiffs' Rehabilitation Act claims," the Court will analyze the claims in tandem.[36]  See Hargrave v. Vermont, 340 F.3d at 35; Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 85 (2d Cir. 2004) ("Since the standards adopted by Titles II and III of the ADA

---

[34]  The Supreme Court has granted certiorari in United States v. Georgia, 125 S. Ct. 2256 (2005), to determine whether Title II of the ADA validly abrogates state sovereign immunity for suits by prisoners with disabilities challenging discrimination by state-operated prisons.

[35]  Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

[36]  Section 504 of the Rehabilitation Act provides in pertinent part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

are, in most cases, the same as those required under the Rehabilitation Act, . . . we consider the merits of these claims together."); Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003) ("[U]nless one of those subtle distinctions [between the Rehabilitation Act and the ADA] is pertinent to a particular case, we treat claims under the two statutes identically."), cert. denied, 541 U.S. 936, 124 S. Ct. 1658 (2004); K.M. v. Hyde Park Cent. Sch. Dist., 381 F. Supp. 2d at 357; Blatch v. Hernandez, 360 F. Supp. 2d at 630.

> Pursuant to the ADA, a "qualified individual with a disability" means
>
> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  Under the statutory definition, Doe is not "a qualified individual with a disability" with respect to CASAT or any temporary release program because, as he recognizes, he is a violent felon, with a history of recidivism, and violent recidivists are not eligible for temporary release programs.  (See pages 7-8, 12 above.)  Doe therefore, as a matter of law, cannot prove the elements of his ADA or Rehabilitation Act claims.

Moreover, Doe's exclusion from any temporary release program has not been based on his disability as an addict, but rather on his status as a violent felon and recidivist.  (See pages 7-8, 12 above.) Thus, Doe has not been denied access to a DOCS program by reason of his disability and cannot prove his ADA or Rehabilitation Act claim based on this element of an ADA claim as well.[37]

---

[37]    The Court assumes for purposes of this motion, as defendants do (see Defs. Br. at 22), that Doe qualifies as "disabled" under the statute as a result of his drug addiction.  See generally

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment should be <u>GRANTED</u> in all respects and the case dismissed.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 40 Centre Street, Room 410, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Secretary of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u>

---

<u>Reg'l Econ. Cmty. Action Program</u> v. <u>City of Middletown</u>, 294 F.3d 35, 46 (2d Cir.) (discussing the fact that drug addiction can be a disability under the ADA), <u>cert. denied</u>, 537 U.S. 813, 123 S. Ct. 74 (2002).

825 (1992); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek

v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d

Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:       New York, New York
             November 22, 2005

                                          Respectfully submitted,


                                          Andrew J. Peck
                                          United States Chief Magistrate Judge


Copies to:   "John Doe"
             Steven N. Schulman, Esq.
             Judge George B. Daniels

H:\OPIN\DOE